# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| ELEPRENEURS HOLDINGS, LLC d/b/a ELEPRENEUR, LLC and ELEPRENEURS U.S., LLC d/b/a ELEPRENEURS, LLC<br><br>*Plaintiffs*,<br><br>v.<br><br>LORI ANN BENSON, ANDREA ALTHAUS, and LINDSEY BUBOLTZ<br><br>*Defendants*. | CIVIL ACTION NO. 4:21-CV-00026<br>Judge Mazzant |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiffs' Motion for a Preliminary Injunction (Dkt. #7). Having considered the motion and the relevant pleadings, the Court finds that Plaintiffs' motion should be **GRANTED in part** and **DENIED in part**.

## BACKGROUND

This case arises out of the business relationship between Plaintiffs and Defendants. Plaintiff Elepreneurs U.S., LLC, sells and markets "various health, wellness and happiness products and services through a direct sales community of independent contractors" (Dkt. #2 at p. 5). Elepreneurs U.S. utilizes a network of Distributors to "create[] an up-line and down-line organizational structure whereby successful Distributors[1] can develop substantial 'down-line' Distributor networks totaling hundreds of other individuals" (Dkt. #2 at pp. 5–6).

---

[1] The Distributors are responsible for "market[ing] and sell[ing] a variety of health, wellness and happiness products distributed exclusively under the 'Elevacity' trade name" and "recruit[ing] additional individuals into the Elepreneurs Distributor system to further promote and sell products and services to an increasing network of customers and other Distributors" (Dkt. #2 at p. 5).

In 2018, Plaintiffs entered into business agreements with each Defendant, whereby the Defendants would serve as independent contractors for Plaintiffs. Defendants remained in their respective positions until December 15, 2020, when each resigned as a Distributor.

On January 14, 2021, the Court extended the temporary restraining order entered by the state court.[2] On January 21, 2021, Plaintiffs filed a motion for a preliminary injunction (Dkt. #7). On January 26, 2021, Plaintiffs filed an emergency motion seeking a second extension of the temporary restraining order (Dkt. #9). On January 27, 2021, Defendants filed a response to the emergency motion (Dkt. #10). Due to the opposed nature of the motion, the Court set a preliminary injunction hearing for January 28, 2021, at 1 p.m. (Dkt. #11). On January 28, 2021, Defendants filed a response opposing the preliminary injunction sought by Plaintiffs (Dkt. #14). On January 29, 2021, Plaintiffs filed a reply (Dkt. #16). On February 3, 2021, Defendants filed a sur-reply (Dkt. #21).

## LEGAL STANDARD

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* Nevertheless, a movant "is not required to prove its case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390,

---

[2] The case was originally filed in state court. The state court entered a temporary restraining order against Defendants. The day before the hearing occurred, Defendants removed the case to this Court.

395 (1981)). The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## ANALYSIS

Plaintiffs ask the Court to enjoin Defendants from:

(1) making disparaging comments, whether verbal, written, in person, on social media and/or any other media forum about [Plaintiffs], their business, their products, other distributors, and their role in the Third Party Transaction (as defined in the December 31, 2020 Temporary Restraining Order and Notice of Hearing on Plaintiffs' Application for Temporary Injunction; (2) making comments, whether verbal, written, in person, on social media and/or any other media forum, which case Plaintiffs in a negative light or which constitute false, misleading, disparaging or deceptive postings; (3) soliciting, inducing, hiring or attempting to solicit, induce, or hire and Distributor, employee, customer, supplier, or vendor of [Plaintiffs] until after May 15, 2021; and/or (4) revealing or disseminating the intellectual property, proprietary information, trade secrets and/or Confidential Information of [Plaintiffs]

(Dkt. #7 at p. 9). Plaintiffs contend that they have established that they can show all four elements required to obtain a preliminary injunction. The Court addresses the four elements in turn.

### I. Substantial Likelihood of Success on the Merits

Plaintiffs assert they have presented a "*prima facie* case on their claims of breach of contract, tortious interference with business relationships, and misappropriation/theft of trade secrets and proprietary information" (Dkt. #7 at p. 10).

#### a. Breach of Contract

Plaintiffs argue that they have a substantial likelihood of success on the merits of their breach of contract claim.

"To establish a breach-of-contract-claim under Texas law, a plaintiff must show '(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach.'" *Wells v. Minn. Life Ins. Co.*, 885 F.3d 885, 890 (5th Cir. 2018) (quoting *Hunn v. Dan Wilson*

3

*Homes, Inc.*, 789 F.3d 573, 579 (5th Cir. 2015)). Plaintiffs assert nearly identical facts regarding each Defendant's purported breach of contract.

### i. Existence of Valid Contract

Plaintiffs claim each Defendant signed three documents upon enrollment as an Elepreneurs distributor: (1) the Elepreneurs Agreement; (2) the Policies and Procedures of Elepreneurs LLC; and (3) the Elepreneurs Social Media and Online Policy Guide (collectively, the "Agreements"). Defendants contest this claim.[3] However, Plaintiffs submitted screenshots from the Elepreneurs Administrative Portal that purportedly show confirmation that each Defendant did, in fact, sign the Agreements.[4] Further, Plaintiffs note that "[a] distributor cannot sell products on behalf of [Plaintiffs] or participate in the Elepreneurs system without completing the[] [aforementioned] steps to accept the Agreements" (Dkt. #16, Exhibit 1 at p. 2). Not only did each Defendant allegedly sign the original Agreements, but each purportedly also accepted subsequent amendments to the Agreements.[5]

Plaintiffs have submitted evidence supporting their claim that Defendants signed an electronic contract. "Texas courts have recognized the validity of electronic contracts." *Bongalis-Royer v. RJ Worldwide, LLC*, No. 4:17-cv-330, 2015 WL 12778846, at *5 (E.D. Tex. July 16, 2015) (citing *Barnett v. Network Sol.*, 38 S.W.3d 200, 204 (Tex. App.—Eastland 2001, pet. denied). The manner in which the contracts were signed is often classified as "clickwrap"—a type

---

[3] According to Defendants, "Elepreneurs did not have a written agreement in place when Benson joined, and she did not sign such an agreement" (Dkt. #14 at p. 2). Regarding Althaus, Defendants assert that she "was awarded the Elepreneurs business when she divorced [her husband] in 2020, but she was never given any paperwork to formally transfer the business to her" (Dkt. #14 at p. 6). Finally, Defendants claim that Buboltz "did not sign any agreements," even though "she does remember being required to check some boxes during the enrollment process" (Dkt. #14 at p. 7).
[4] The screenshots provided to the Court are far from clear. However, the dates provided on the screenshots appear to coincide with when Defendants joined Plaintiffs' business.
[5] The Court notes that Defendants claim Althaus never signed the original Agreements because the business was established in her then-husband's name. However, according to Plaintiffs, Althaus would have been unable to continue distributing for Plaintiffs unless the she consented to the Agreements.

4

of agreement that "'allows a consumer to assent to the terms of a contract by selecting an 'accept' button on the web site' and '[i]f the consumer does not accept the terms of the agreement, the web site will not complete the transaction.'" *Id.* (quoting *Am. Eyewear, Inc. v. Peeper's Sunglasses and Accessories, Inc.*, 106 F. Supp. 2d 895, 904 n.15 (N.D. Tex. 2000)). "Texas courts have repeatedly upheld the validity of 'clickwrap' agreements." *Id.* (citations omitted). After reviewing the evidence submitted, the Court finds that Plaintiffs have, at a minimum, made the requisite showing that contracts existed between Plaintiffs and each Defendant.

Even assuming Plaintiffs did not submit sufficient evidence that each Defendant signed the Agreements, Plaintiffs also submit various documentation showing that each Defendant contacted Elepreneur Compliance at one time or another regarding other breaches of the Agreements by other Distributors (Dkt. #16, Exhibit 1 at pp. 9–36). As this Court has previous noted, actions taken by a party to enforce agreements against other representatives show the subjective intent to be bound by the same agreements. *See WorldVentures Mktg., LLC v. Rogers*, No. 4:18-cv-00498, 2018 WL 4169049, at *4 (E.D. Tex. Aug. 30, 2018). Thus, the actions taken by Defendants to enforce the Agreements against other Distributors further supports finding that a contract existed between the parties.

### ii. Performance or Tendered Performance

The parties do not seem to dispute that Plaintiffs performed under the contract. Plaintiffs allowed Defendants access to the system and employed each Defendant as a Distributor until the Defendants resigned.

### iii. Breach of the Contract

Plaintiffs assert that each Defendant breached their respective contracts by engaging in solicitation in violation of the contracts' no-solicitation clauses. Defendants respond that the

evidence presented by Plaintiffs "does not establish improper solicitation by any of the Defendants" (Dkt. #14 at p. 9). Further, Defendants claim any solicitation by Defendants was directed at those downstream Distributors expressly allowed to be solicited under the Policies and Procedures.[6]

Plaintiffs emphasize that the Policies and Procedures only allow for solicitation of "a Distributor's personally sponsored downline Distributors" (Dkt. #16 at p. 6) (emphasis omitted). According to evidence submitted by Plaintiffs, a personally sponsored downline "constitutes those persons directly sponsored by the Departing Distributor and not anyone with whom that Departing Distributor did not directly sponsor, also known as the Derivative Downline" (Dkt. #16, Exhibit 1 at p. 3). Defendants strongly refute this definition. However, the plain language of "personally sponsored downline" does, on its face, support Plaintiffs' definition.

### 1. Benson

Plaintiffs assert that Benson solicited Jessica Sessums ("Sessums") in violation of the non-solicitation clause outlined in the Policies and Procedures. Specifically, Plaintiffs reference a conversation between Benson and Sessums, whereby Plaintiffs claim that "[v]iewing the exchange between Benson and Sessums from an objective standpoint, it is abundantly clear that Benson's comments to Sessums were intended to reflect negatively upon Sessums'[s] position with Plaintiffs and present a seemingly better opportunity with Benson's new competing network marketing company, Amplifei, which Benson actually encouraged Sessums to do" (Dkt. #16 at p. 8).

Benson did inform Sessums that "[Sessums] can keep [her] check [with Plaintiffs] and build a new [business]" (Dkt. #14, Exhibit 1 at p. 15). Benson further stated that "[she] would love to help [Sessums] create something [at Amplifei] and [Sessums] [could] keep [her] income

---

[6] Defendants argue that the Elepreneurs Agreement conflicts with the Policies and Procedures regarding solicitation. It appears undisputed that when this type of conflict exists, the Policies and Procedures govern.

[at Elepreneurs]" (Dkt. #14, Exhibit 1 at p. 15).  After reviewing the entirety of the conversation between Benson and Sessums, the Court does not find overwhelming proof that Benson's conversation was intended to solicit Sessums.  However, the Court does believe that Plaintiffs have made a *prima facie* showing that Benson did violate the terms of the Policy and Procedures by encouraging Sessums to take an opportunity at another company.  Further, Benson expressly disclaims being Sessum's sponsor—seemingly bringing Benson out of the exception that would allow for Sessum's recruitment.

### 2.  Althaus

Though Plaintiffs are less clear on how Althaus breached her contract with Plaintiffs, the argument appears to be that Althaus solicited Michael Hassett ("Hassett") in violation of the non-solicitation clause of the Policies and Procedures during a December 15, 2020 phone call.  However, the supplemental declaration of Hassett states that "[He] was in the background and did not speak up loudly on the telephone call on December 15, 2020, so it is possible that [Althaus] may not have been aware of [his] presence on the call" (Dkt. #16, Exhibit 2 at p. 2).  Hassett's statement, coupled with the fact that Althaus called Megan Homokla's ("Homolka") phone, leads the Court to believe that Althaus was not, in fact, attempting to solicit Hassett.  At most, Althaus could arguably have been attempting to solicit Homolka.  However, it appears undisputed that Homolka is a personally sponsored downline distributor of Althaus'.  Thus, solicitation of Homolka would not violate any Agreement between Plaintiffs and Althaus.  The Court therefore finds that Plaintiffs have not made the requisite *prima facie* showing that Althaus breached the contract between the parties.

### 3. Buboltz

Plaintiffs claim Buboltz solicited Sadie Endicott ("Endicott") in violation of the non-solicitation clause in the Policies and Procedures. Plaintiffs assert that "an objective assessment of [Endicott's] testimony clearly evidences that Ms. Buboltz made statements prohibited by the non[-]solicitation provision" (Dkt. #16 at p. 10).

The messages between Buboltz and Endicott took place on December 13, 2020. Buboltz resigned as Plaintiffs' Distributor two days later. Thus, Buboltz herself had not even left Elepreneurs. Further, after reviewing the messages in their entirety, the Court cannot determine that Buboltz either solicited or attempted to solicit Endicott. Buboltz undoubtedly voiced frustration over the Elepreneurs business; however, Buboltz also stated that she was "dreading [the website switch] already"—seemingly indicating that Buboltz intended to stay with Elepreneurs (Dkt. #2, Exhibit 6 at p. 6). Nowhere does Buboltz indicate she intended to leave Elepreneurs, and nowhere does Buboltz even hint that Endicott should leave Elepreneurs. Further, as Defendants point out, Endicott never says that Buboltz solicited her. Rather, Endicott speculated that Buboltz "was criticizing Elepreneurs in an effort to determine my interest in leaving Elepreneurs" (Dkt. #2, Exhibit 6 at p. 2). However, an objective reading of the conversation does not lend itself to Endicott's interpretation. Thus, the Court does not find that Plaintiffs have established a *prima facie* case for breach of contract against Buboltz.

### iv. Damages

Plaintiffs have only made a *prima facie* showing that Benson breached the Agreements. Regarding damages, Plaintiffs contend that "any disruption to [Elepreneurs'] 'network' of distributors inherently causes an unquantifiable effect on the company's ability to continue to promote and sell its products because such networks include an untold number of people who are

connected, formally or informally, electronically or verbally, to the company's distributors" (Dkt. #7, Exhibit 1 at pp. 5–6). Further, Plaintiffs claim that the damages are exemplified when former Distributors attempt to solicit current Distributors into joining competing companies—such as Amplifei. According to Plaintiffs, damages are "truly exponential in nature and not subject to calculation given that a distributor's productivity is unique to that specific person" (Dkt. #7, Exhibit 1 at p. 6). Further, the Elepreneurs Agreement has a provision regarding damages and injunctive relief. Section twenty-five of the Elepreneurs Agreement states:

> I agree that upon a breach of this Agreement that the Company will be immediately and irreparably harmed and can not be made whole solely by monetary damages. I agree that the remedy at law for any breach of any provision of this Agreement shall be inadequate and that, in addition to any other remedies, in law or in equity it may have, the Company shall be entitled, without the necessity of proving actual damages, to temporary and permanent injunctive relief to prevent the breach of any provision of this Agreement and/or to compel specific performance of this Agreement

(Dkt. #2, Exhibit 1 at p. 5). The evidence submitted by Plaintiffs, coupled with the language of section twenty-five, satisfies the Court that Plaintiffs have presented a *prima facie* case to support the damages element of their breach of contract claim.

The Court finds that Plaintiffs have satisfied the requisite burden with regard to Plaintiffs' breach of contract claim against Benson. Plaintiffs have not, however, presented a *prima facie* case of breach of contract as to Althaus or Buboltz.

### b. Tortious Interference with Business Relationships

Plaintiffs also argue that they have a substantial likelihood of success on the merits of their tortious interference with business relationships claim.[7]

---

[7] Two causes of action for tortious interference exist: tortious interference with a contract and tortious interference of prospective business relations. In its motion, Plaintiffs argue the elements of tortious interference with an existing contract.

9

"Under Texas law, the elements of tortious interference with a contract are: (1) the existence of a contract, (2) willful and intentional interference, (3) interference that proximately caused damages, and (4) actual damage or loss." *Mumfrey v. CVS Pharm., Inc.*, 719 F.3d 392, 402 (5th Cir. 2013) (citing *Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998) (per curiam)).

Plaintiffs have submitted evidence supporting a finding that a contract existed between the Plaintiffs and their Distributors. Further, Plaintiffs have shown that Benson has willfully and intentionally interfered with Sessums' contract by attempting to solicit Sessums.[8] Plaintiffs have shown that the interference proximately caused loss (Dkt. #7, Exhibit 1 at pp. 5–6). Plaintiffs have not, however, submitted evidence showing the existence of the fourth element—that the interference caused actual damage or loss.

Plaintiffs present no evidence supporting a finding that the solicitation of Sessums was successful. Plaintiffs do not allege that Benson's solicitation of Sessums resulted in any other Distributor leaving the company. In fact, Plaintiffs present no evidence that any actual damage or loss was sustained at all as a result of Benson's attempted solicitation of Sessums—the only tortious interference alleged by Plaintiffs.

After reviewing the submitted evidence, Plaintiffs have not presented a *prima facie* case to support their claims for tortious interference with business relationships.

### c. Misappropriation/Theft of Trade Secrets and Proprietary Information

Plaintiffs finally argue that they have a substantial likelihood of success on the merits of their misappropriation/theft of trade secrets and proprietary information claim. Plaintiffs bring two trade secret misappropriation claims: one under Texas common law and one under the Texas Uniform Trade Secrets Act ("TUTSA").

---

[8] Plaintiffs have not shown that either Althaus or Buboltz intentionally interfered with the contracts between Plaintiffs and any Distributor.

"Trade secret misappropriation under Texas law is established by showing: (a) a trade secret existed; (b) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (c) use of the trade secret without authorization from the plaintiff." *Phillips v. Frey*, 20 F.3d 623, 627 (5th Cir. 1994) (collecting cases). Under TUTSA, "[t]he elements of misappropriation of trade secrets are: (1) ownership of a trade secret; (2) misappropriation of the trade secret; and (3) an injury, if the plaintiff is seeking damages." *Morgan v. Clements Fluids South Texas, Ltd.*, 589 S.W.3d 177, 186 (Tex. App.—Tyler 2018, no pet.) (citing TEX. CIV. PRAC. & REM. CODE §§ 134A.002(1), (3), (6), 134A.004(a)).

Plaintiffs assert that a list of Elepreneurs Distributors (the "List") is a trade secret. To claim trade secret protection over information, the owner of the trade secret must take reasonable steps to maintain the secrecy of the information." *See Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (noting that "[o]ne who voluntarily discloses information or who fails to take reasonable precautions to ensure its secrecy cannot properly claim that the information constitutes a trade secret") (citing *E. I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1015 (5th Cir. 1984).

Plaintiffs claim that they have "at all times taken reasonable measures to keep its list of Elepreneurs Distributors secret" and that "the list of Elepreneurs Distributors has significant economic value by not being known to other persons who can obtain economic value for its disclosure" (Dkt. #7, Exhibit 2 at pp. 5–6). Further, section eleven of the Elepreneurs Agreement states, in relevant part, that:

> [T]he Company has the exclusive proprietary interest in its customer lists, customer information developed by or for the Company (such as credit data, product purchase information, and customer profile data), Elepreneur lists, manufacturing procedures, formulas, source codes, product development and in all operating, financial, and marketing materials; and . . . all such information is confidential

(Dkt. #2, Exhibit 1 at p. 3).  The Distributors agree that they "shall not use or disclose such information to any third party except in strict accordance with this Agreement and the Policies & Procedures" (Dkt. #2, Exhibit 1 at p. 3).  Although the Court is not required to make this determination at the injunctive relief stage, there is evidence establishing that Plaintiffs have taken reasonable steps to maintain the secrecy of their trade secrets by requiring Distributors to sign the Elepreneurs Agreement containing the above-quoted language.

Plaintiffs contend that all three Defendants have possession of the List.  However, the evidence presented only supports a finding that one Defendant, Althaus, arguably has access to the List.  The only evidence offered as to Benson and Buboltz is a conclusory statement that "Defendants have a list of Elepreneurs Distributors and they have called upon or intend to call upon the persons on that list" (Dkt. #7, Exhibit 1 at p. 5).  Further, in evidence submitted regarding a phone conversation between Althaus and Hassett, Hassett states that "[s]pecifically, Andrea Althaus (Frazeen) said she had a list of Elepreneurs distributors and customers and that she planned to contact them all" (Dkt. #16, Exhibit 2 at p. 2).  Hassett only mentions that Benson and Buboltz were working with Althaus to contact as many Distributors as possible—a claim unsubstantiated by other evidence presented.  Thus, the Court finds that Plaintiffs have not presented a *prima facie* case against Benson and Buboltz for trade secret misappropriation.

The Court does find a *prima facie* case has been made against Althaus, however.  "[A]t the preliminary injunction stage, a plaintiff need not establish that a defendant actually misappropriated any trade secrets; the fact that a defendant is in a position to possibly use trade secrets is sufficient to warrant injunctive relief."  *Rogers*, No. 4:18-cv-498, 2018 WL 4169049, at *8 (citation omitted).  Plaintiffs have presented sufficient evidence to show that Althaus is in possession of the List.  Further, Plaintiffs have shown that Althaus is in a position to possibly use

the List.  Thus, a *prima facie* case has been made against Althaus regarding trade secret misappropriation.

Plaintiffs have presented a *prima facie* case of breach of contract against Benson and trade secret misappropriation against Althaus.  Plaintiffs have not shown a likelihood of success on the merits of any claim against Buboltz.  The Court will proceed accordingly.

## II. Substantial Threat of Irreparable Harm

Plaintiffs must demonstrate they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  "[H]arm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).  However, "the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Id.*  An injunction is appropriate only if the anticipated injury is imminent and not speculative. *Winter*, 555 U.S. at 22.

Plaintiffs assert that Defendants' actions "have caused Plaintiffs to suffer damage which cannot be adequately compensated in monetary damages" (Dkt. #7 at p. 17). Specifically, Plaintiffs contend that "the nature of the network marketing industry in which Plaintiffs and Defendants operate" exasperates Plaintiffs' need for injunctive relief (Dkt. #7 at p. 17).

### a. Benson

As noted above in section I(a)(iv), the Elepreneurs Agreement includes a provision stating that in the event of breach, Plaintiffs will suffer immediate and irreparable harm.  Further, Plaintiffs have established that the solicitation of Distributors outside of a former Distributor's "personally sponsored downline," as this Court has currently defined the phrase, would immeasurably injure Plaintiffs' business because the business is network-based and relies upon this network to promote

and sell products (Dkt. #7, Exhibit 1 at pp. 5–6).  After considering section twenty-five of the Elepreneurs Agreement and the additional proof submitted by Plaintiffs, the Court finds that Plaintiffs have established a substantial threat of irreparable harm regarding Benson's breach of contract claim.

### b. Althaus

Plaintiffs have shown a substantial threat of irreparable harm regarding Althaus's misappropriation of trade secrets.  Plaintiffs, through John Thatch[9] ("Thatch"), have shown that the use of the List by Althaus "will cause Plaintiffs to incur a loss of a business advantage, including a loss of distributors and end-use customers for the Elevacity Product Line" (Dkt. #7, Exhibit 1 at p. 5).  "The use of an employer's confidential information and the possible loss of customers is sufficient to establish irreparable harm."  *TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 757 (S.D. Tex. 2009).  Plaintiffs have sufficiently established that Althaus has used Plaintiffs' confidential information, and the continued use would possibly cause a loss of customers.  The Court therefore finds that use of the List taken by Althaus, in violation of the Elepreneurs Agreement, until a trial on the merits would irreparably harm Plaintiffs.

## III.    Balance of Hardships

When deciding whether to grant an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (citation omitted).  In other words, this element "involves an evaluation of the severity of the impact on defendant should be temporary injunction be granted and the hardship that would occur to plaintiff if the injunction should be denied."  11A CHARLES

---

[9] John Thatch serves as the President and Chief Executive Officer of the parent company of Elepreneurs.

ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 2948.2 (3d ed. 2018).

> The Court first notes that Plaintiffs seek to enjoin Defendants from:
>
> (a) making disparaging comments, whether verbal, written, in person, on social media and/or any other media forum about Elepreneurs, their business, their products, other distributors, and their role in the Third Party Transaction (as defined in the December 31, 2020 Temporary Restraining Order and Notice of Hearing on Plaintiffs' Application for Temporary Injunction; (b) making comments, whether verbal, written, in person, on social media and/or any other media forum, which cast Elepreneurs in a negative light or which constitute false, misleading, disparaging or deceptive postings; (c) soliciting, inducing, hiring or attempting to solicit, induce, or hire any Distributor, employee, customer, supplier, or vendor of Elepreneurs until after May 15, 2021; and/or (d) revealing or disseminating the intellectual property, proprietary information, trade secrets, and/or Confidential Information of Elepreneurs

(Dkt. #7, Exhibit 2 at p. 7). The preliminary injunction, as written, would place severe restraints on Defendants—most unjustified by the evidence presented before the Court. As written, the harm to Defendants is greater than the harm to Plaintiffs. The Court finds no reason to enjoin Buboltz. However, the Court does find narrow reasons to enjoin Benson and Althaus. The harm of losing Distributors due to Benson's improper solicitation outweighs a narrow injunction against Benson. Similarly, the Court finds that the harm of using Plaintiffs' confidential information outweighs a narrow injunction against Althaus.

**IV.    Public Interest**

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger*, 465 U.S. at 312).

Plaintiffs contend that "Defendants [do not] risk any harm or damage by merely complying with their contractual and common law duties" (Dkt. #7 at p. 19). Further, Plaintiffs claim that

15

they have "no protections from Defendants' continued activity in violation of their contractual and common law obligations but for the issuance of the requested injunctive relief" (Dkt. #7 at p. 19).

"This factor overlaps substantially with the balance-of-hardships requirement." *WorldVentures Holdings, LLC v. MaVie*, No. 4:18-cv-00393, 2018 WL 3570921, at *5 (E.D. Tex. July 25, 2018) (citing *Winter*, 555 U.S. at 24). The limited injunction issued in this case would simply prohibit Benson from improperly soliciting Distributors in violation of the Elepreneurs Agreement and prevent Althaus from utilizing Plaintiffs' confidential information. The Court cannot see how the public would be disserved by requiring Benson to comply with her contractual obligations. Additionally, because "confidentiality agreements, along with other, similar types of agreements, encourage employers to entrust confidential information and client relationships to key employees," *Id.* (citing *Redi-Mix Sols., Ltd. v. Express Chipping, Inc.*, No. 6:16-cv-298, 2016 WL 7634050, at *10 (E.D. Tex. Dec. 2, 2016)), the Court finds the public interest will not be disserved by the issuance of a narrow injunction against Althaus.

## V. Scope of the Preliminary Injunction

Finally, the Court must determine the scope of the preliminary injunction. As analyzed above, the Court has determined that a narrow preliminary injunction should be issued as to Benson and Althaus. The Court is confident that enjoining Benson from soliciting, inducing, hiring or attempting to solicit, induce, or hire any Distributor, employee, customer, supplier, or vendor of Elepreneurs in violation of the Elepreneurs Agreement until after May 15, 2021, will ensure Plaintiffs do not suffer irreparable harm until a trial on the merits is held. Additionally, enjoining Althaus from revealing or disseminating the intellectual property, proprietary information, trade secrets, and/or Confidential Information of Elepreneurs will also suffice to ensure Plaintiffs do not suffer irreparable harm until a trial on the merits is held.

## VI. Bond

The party moving for a preliminary injunction must give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). The amount of that security "is a matter for the discretion of the trial court." *Kaepa Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978)). Plaintiffs shall post a bond in the amount of $1,000 unless the money previously paid to the state court for the issuance of the Temporary Restraining Order is still in the registry for that court, in which case no additional bond is necessary.

## CONCLUSION

It is therefore **ORDERED** that Plaintiffs' Motion for a Preliminary Injunction (Dkt. #7) is hereby **GRANTED in part** and **DENIED in part**.

It is further **ORDERED** that Defendant Lori Benson is hereby **ENJOINED** from soliciting, inducing, hiring or attempting to solicit, induce, or hire any Distributor, employee, customer, supplier, or vendor of Elepreneurs in violation of the Elepreneurs Agreement until after May 15, 2021.

It is further **ORDERED** that Defendant Andrea Althaus is hereby **ENJOINED** from revealing or disseminating the intellectual property, proprietary information, trade secrets, and/or Confidential Information of Elepreneurs.  Althaus is to turn over the Distributor's List within ten days of entry of this Order.

**SIGNED this 5th day of February, 2021.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE