IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ELEPRENEURS HOLDINGS, LLC <br> d/b/a ELEPRENEUR, LLC, <br> ELEPRENEURS U.S., LLC d/b/a <br> ELEPRENEURS, LLC, and <br> SHRG IP HOLDINGS, LLC <br><br> Plaintiffs, <br><br> v. <br><br> LORI ANN BENSON, ANDREA <br> ALTHAUS, LINDSEY BUBOLTZ, <br><br> Defendants. | § § § § § § § § § § § § § § § § | Case No. 4:21-cv-00026-ALM |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiffs Elepreneurs Holdings, LLC d/b/a Elepreneur, LLC, Elepreneurs U.S., LLC d/b/a Elepreneurs, LLC and SHRG IP Holdings, LLC file this First Amended Complaint against Defendants Lori Ann Benson, Andrea Althaus, and Lindsey Buboltz, in accordance with the Court's Order and Advisory [ECF No. 4], as follows:

**Parties and Venue**

1. Plaintiff Elepreneurs Holdings, LLC d/b/a Elepreneur, LLC ("Elepreneurs") is a Texas limited liability company with its principal office in Plano, Collin County, Texas. Elepreneurs is a citizen of the State of Texas.

2. Plaintiff Elepreneurs U.S., LLC d/b/a Elepreneurs, LLC ("Elepreneurs U.S.") is a Texas limited liability company with its principal office in Plano, Collin County, Texas. Elepreneurs U.S. is a citizen of the State of Texas.

3. Plaintiff SHRG IP Holdings, LLC ("SHRG IP") is a Texas limited liability company with its principal office in Plano, Collin County, Texas. SHRG IP is a citizen of the State of Texas.

4. Defendant Lori Ann Benson ("Benson") is an individual residing in Ellisville, Mississippi. Defendant Benson is a citizen of the State of Mississippi.

5. Defendant Andrea Althaus ("Althaus") is an individual residing in Grimes, Iowa. Defendant Althaus is a citizen of the State of Iowa.

6. Defendant Lindsey Buboltz ("Buboltz") is an individual residing in Omaha, Nebraska. Defendant Buboltz is a citizen of the State of Nebraska.

7. This Court has original jurisdiction over this proceeding pursuant to Title 28 United States Code Section 1332 because the amount in controversy exceeds $75,000 (exclusive of interest and costs) and Plaintiffs and Defendants are citizens of different states.

8. Venue is proper in this Court pursuant to Title 28 United States Code Section 1391 because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Texas, and the agreements between Plaintiffs and Defendants were performable in the Eastern District of Texas.

## Introduction

9. Plaintiffs seek injunctive and other relief to prevent Defendants Benson, Althaus, and Buboltz, former high-ranking members of the Elepreneurs U.S. salesforce (commonly known as "Distributors"), from stealing Elepreneurs' Distributors and customers, in direct violation of their non-solicitation and other agreements, for the benefit of a competing company, AmplifeiIntl, LLC, d/b/a Hapinss ("Amplifei"), by utilizing Plaintiffs' trade secrets, confidential information and trading off of Plaintiffs' Elevate Smart Coffee™ product.

**Factual Background**

10. Elepreneurs is the sole owner of Elepreneurs U.S.

11. Plaintiff SHRG IP is the owner of valuable trademarks including Elevate Smart Coffee$^{TM}$, Serial No. 88/176803, pending with the United States Patent & Trademark Office.

12. Elepreneurs U.S. is a recognized worldwide leader in selling and marketing various health, wellness and happiness products and services through a direct sales community of independent contractors.

13. The business of Elepreneurs U.S. includes a network of Distributors: (i) who market and sell a variety of health, wellness and happiness products distributed exclusively under the "Elevacity" trade name (the "Elevacity Product Line"), and (ii) recruit additional individuals into the Elepreneurs Distributor system to further promote and sell products and services to an increasing network of customers and other Distributors.  This network creates an up-line and down-line organizational structure whereby successful Distributors can develop substantial "down-line" Distributor networks totaling hundreds of other individuals.

14. Among the products in the Elevacity Product Line is Elevate Smart Coffee$^{TM}$, a weight-management, mood-enhancing coffee which was originally sold from 2017 until April 29, 2019 with a constituent component known as DMHA (also known as "2-amino-5-methylhaptane"), a substance which was identified on April 29, 2019 by the United States Food and Drug Administration as a prohibited product ingredient.  The formula for the "Original" Elevate Smart Coffee$^{TM}$ was exclusively licensed to Plaintiffs by Alternative Laboratories.

15. The "Original" Elevate Smart Coffee$^{TM}$ was a huge success and resulted in significant financial benefits to Plaintiffs and its Distributors.  The subsequent formulation of the Elevate Smart Coffee$^{TM}$ currently in use by Elepreneurs U.S. is also manufactured by Alternative Laboratories exclusively for Elepreneurs U.S.

16.     Plaintiffs have invested considerable time, money and resources in protecting their products, business, culture, and community of Distributors in order to foster and grow a successful, collaborative and valuable business model.

17.     As a result, the departure of any Distributor from Plaintiffs' organization can have substantial adverse effects on Plaintiffs' network and business, in terms of the continued production of both up-line and down-line personnel within the Elepreneur Distributor network. Once a Distributor leaves Elepreneurs or any network marketing company, it is unlikely that person will ever come back.

18.     Accordingly, in order to protect their products, business, culture, and community of Distributors, Plaintiffs require each Distributor, upon joining their organization, to execute various agreements outlining the terms of each Distributor's relationship with Plaintiffs and agreeing to and acknowledging the various policies and procedures, applicable to all Distributors.

19.     On the dates set forth below, each of the Defendants electronically-signed an agreement with Elepreneurs, LLC (aka "Elepreneurs, U.S., LLC") (the "Elepreneurs Agreement") as an independent contractor to, among other things, market and sell the Elevacity Product Line as an authorized Distributor:

- Defendant Lori Ann Benson          January 11, 2018
- Defendant Andrea Althaus           February 19, 2018
- Defendant Lindsey Buboltz          March 26, 2018

20.     A true and correct copy of the Elepreneurs Agreement is attached hereto as Exhibit "A."

21.     In conjunction with the Elepreneurs Agreement, and as referenced and incorporated therein, Defendants Benson, Althaus and Buboltz additionally executed and agreed

to be bound by the "Policies & Procedures of Elepreneurs LLC" and the "Elepreneurs Social Media & Online Policy Guide," true and correct copies of which are attached hereto as <u>Exhibit "B"</u> and <u>Exhibit "C,"</u> respectively.  The Elepreneurs Agreement, Policies & Procedures of Elepreneurs LLC, and Elepreneurs Social Media & Online Policy Guide are collectively referred to herein as the "Agreements."

22.     The Agreements contain various provisions which provide that Distributors, including Defendants Benson, Althaus and Buboltz, are prohibited from utilizing Plaintiffs' confidential information, soliciting other Distributors to leave Elepreneurs or terminate their relationships with Elepreneurs, using a social media site to draw inquiries from other Distributors about a new network marketing company, for the time periods described below, or disparaging Plaintiffs by making negative comments.  The Agreements, contain the following prohibitions, among others:

    A.     <u>Confidential Information</u>.

> ***Proprietary Rights / Use of Company Materials***. *I acknowledge that the Company's trademarks, service marks, tradenames, patents, and copyrighted materials are owned solely by the Company, and that use of such marks and materials by me must be in compliance with the Company's written policies, as such may be amended by the Company from time to time. I agree to use only written, recorded, or other promotional or advertising materials which have been produced by the Company and/or approved in writing by the Company prior to use and bear its approval designation. I further agree that the Company has the exclusive proprietary interest in its customer lists, customer information developed by or for the Company (such as credit data, product purchase information, and customer profile data), Elepreneur lists, manufacturing procedures, formulas, source codes, product development and in all operating, financial, and marketing materials; and that all such information is confidential. I shall not use or disclose such information to any third party except in strict accordance with this Agreement and the Policies & Procedures. Confidential information is disclosed to me on a "need-to-know" basis solely for use in my business with the Company. I agree to use my best efforts to keep such information confidential and shall*

> *not use such information to sell products or services other than the Company's products and services or in connection with any other business during the term of and after termination of this Agreement. Upon termination or nonrenewal of this Agreement, I immediately shall cease all use of the Company's trademarks, service marks, and proprietary and confidential information and, if requested by the Company, return all such materials in my possession to the Company.*

(<u>Exhibit "A"</u>, p. 2, ¶ 11),

> ***Confidential Information.*** *"Confidential Information" includes, but is not limited to, the identities, contact information, and/or sales information relating to the Company's Distributors and/or customers: (a) that is contained in or derived from any Distributors' respective Back-Office; (b) that is derived from any reports issued by the Company to Distributors to assist them in operating and managing their Elepreneur business; and/or (c) to which a Distributor would not have access or would not have acquired but for her/his affiliation with the Company. Confidential Information constitutes proprietary business trade secrets belonging exclusively to the Company and is provided to Distributors in strict confidence. Confidential Information shall not be directly or indirectly disclosed to any third party nor used for any purpose other than Distributor's use in building and managing her/his Elepreneur business.*

(<u>Exhibit "B"</u>, p. 6, ¶ 30),

  B. <u>Non-solicitation</u>.

> ***Non-Solicitation / Sale of Other Products.*** *As an inducement for the Company to enter into this Agreement and in consideration of the mutual covenants contained herein, I agree that during the term of this Agreement and for a period of six months thereafter, I shall not, directly or indirectly, on my own behalf or on the behalf of any other person or entity, solicit, induce, or hire or attempt to solicit, induce, or hire any Elepreneur, employee, member, customer, supplier, or vendor of the Company (i) to enter into any business relationship with any other direct sales or network marketing company or individual or (ii) to terminate or alter his or her business or contractual relationship with the Company. I agree that no products or services except for the Company's products or services shall be sold or shown at any event where the Company's products or services are sold or shown.*

(<u>Exhibit "A"</u>, p. 2, ¶ 12),

> *Nonsolicitation.* Elepreneur Distributors are free to participate in other network marketing programs. However, during the term of this Agreement and for one year thereafter, with the exception of a Distributor's personally sponsored downline Distributors, an [sic] Distributor may not directly or indirectly Recruit other Elepreneur Distributors for any other network marketing business. The term "Recruit" means the direct or indirect, actual or attempted, sponsorship, solicitation, enrollment, encouragement, or effort to influence in any other way, another Elepreneur Distributor to enroll or participate in another network marketing opportunity. This conduct constitutes Recruiting even if the Distributor's actions are in response to an inquiry made by another Distributor or customer.

(Exhibit "B", p. 6, ¶ 28),

> *Social Media*. . . . During the term of the Agreement and for 12 calendar months after the cancellation of a Distributor's business for any reason, a Distributor shall not take any action on any social media site on which they discuss or present, or have discussed or presented, the Company's products or the Elepreneur business that may reasonably be foreseen to draw an inquiry from Elepreneur's Distributors relating to the Distributor's other direct selling business activities or products. Violation of this provision shall constitute a violation of the nonsolicitation provision in Policy 28.

(Exhibit "B", p. 3, ¶ 16),

      C.    <u>Disparagement</u>.

> *Negative Comments*. Complaints and concerns about the Company should be directed to the customer Service Department. Distributors must not disparage, demean, or make negative remarks to third parties or other Distributors about the Company, its owners, officers, directors, management, other Elepreneur Distributors, the Marketing and Compensation plan, or the Company's directors, officers, or employees. Disputes or disagreements between any Distributor and the Company shall be resolved through the dispute resolution process, and the Company and Distributors agree specifically not to demean, discredit, or criticize one another on the Internet or any other public forum.

(Exhibit "B", p. 7, ¶ 37), and

D.  Survival.

> ***Survival.*** *The covenants and obligations of me to abide by the arbitration, nonsolicitation, trade secrets, and confidential information covenants contained herein shall survive termination of this Agreement.*

(Exhibit "A", p. 5, ¶ 28).

23.  Amplifei is a newly-formed competitor of Elepreneurs that was formed on March 16, 2020.

24.  On December 15, 2020, Defendants Benson, Althaus and Buboltz resigned their positions as Distributors for Elepreneurs, and upon information and belief, promptly joined Amplifei.

25.  Plaintiffs have discovered that, around the date of their respective resignations and continuing thereafter, Defendants Benson, Althaus and Buboltz have engaged in various acts and wrongful conduct which constitute a breach of their respective obligations under the Agreements, and which violate other laws.

## Defendant Benson - Specific Wrongful Conduct

26.  Specifically, Defendant Benson, following her resignation, made the following statements in a text message exchange with at least one existing Distributor:

- "They gave him 4 multi million dollars so who was wrong"

- "Watch what is going to transpire in the next 30 days and don't forget this conversation and my leaving lots of money on the table for credibility and integrity and losing all income to start over"

- "You will need to start over soon anyway"

- "You can keep your check there and build a new biz"

- "You can stay and help anyone but my point is if they leave and come here and you don't we can't move them later. . . ."

- *"I would love to help you create something here and you keep your income there. You can enroll with Andrea [Althaus] and get rolling"*

27. Upon information and belief, Defendant Benson repeated the foregoing statements to others, including other Distributors.

28. On or about January 31, 2021, Amplifei conducted a live "coffee chat" with 22 other "distributors" and investors on Facebook (the "Coffee Chat Group"), including Defendants Benson and Buboltz.

29. During this nearly two-hour long broadcast, the Coffee Chat Group participants (including Defendants Benson and Buboltz, and other former distributors of Elepreneurs U.S.) discussed the purported "taste" and "benefits" of Amplifei's *new* "Original Coffee" product.

30. Notably, comparisons were made on the Coffee Chat Group to an unnamed coffee product formerly sold and consumed by the participants, with many of them using phrases such as: "*it's like an old friend from a few years ago*" and "*it feels like a family reunion.*" Given the fact that: (i) Amplifei did not have a coffee product prior to the Coffee Chat Group; (ii) the Coffee Chat Group participants were all former distributors of Elepreneurs U.S. who sold the "original" Elevate Smart Coffee$^{TM}$ product; and (iii) the liberal use of the term "Original Coffee" in the Coffee Chat Group, it is an inescapable conclusion that the Original Coffee referred to in the Coffee Chat Group is a reference to Plaintiffs' Elevate Smart Coffee$^{TM}$ product. Defendants and the others were seeking to trade off the name and successful history of the Elevate Smart Coffee$^{TM}$ product and cause confusion or mistake, and deceive others as to the origin, sponsorship, or approval of Amplifei's coffee product.

31. The Coffee Chat Group production was broadcast, not to a closed loop of Amplifei distributors but instead was broadcast to the general public – with the intent to influence the distributors of Elepreneurs U.S.

**PLAINTIFFS' FIRST AMENDED COMPLAINT – Page 9**

32. Also, during the Coffee Chat Group, the canister of "Original Coffee" held up to the camera by one of the participants appears to be remarkably similar to the Elevate Smart Coffee™ canister in all respects: height, circumference, shape and functionality.

33. On January 31, 2021, Amplifei hosted a "Hapi Gut Health" link on a YouTube platform (the "YouTube Post"). The YouTube Post featured a video in which many persons, including Defendants Benson and Althaus, promoted Defendant's "Original Coffee" product.

34. These statements and others of a similar nature, broadcast on the YouTube Post clearly are referring to the Plaintiffs' Original Elevate Smart Coffee™ product given the fact that the phrase "*it's back*" . . . . would be illogical unless such phrase was referring to a product from a prior context, namely the Elevate Smart Coffee™ product.

### Defendant Althaus - Specific Wrongful Conduct

35. Specifically, Defendant Althaus, on the day of her resignation, made the following statements in a telephone conversation with an existing Distributor:

- *Robert Oblon had started a new company selling a health, wellness and happiness product line in competition with Elepreneurs, and that my only hope for continued financial sustenance was to join Mr. Oblon's new company, known as Amplifei. She [Althaus], Lori Benson and Lindsey Buboltz were reaching out to many people with Elepreneurs in an effort to convince them to leave Elepreneurs and enroll with Amplifei. She [Althaus] had a list of Elepreneurs distributors and customers and that she planned to contact them all.*

- *Elepreneurs was under financial strain and would be going out of business soon, and Elepreneurs was engaged in "shady stuff."*

36. Upon information and belief, Defendant Althaus repeated the foregoing statements to others, including other Distributors.

37. Defendant Althaus participated in the YouTube Post. During the YouTube Post, Defendant Althaus proclaims: "*It's back . . . it's really back . . . the Original Coffee.*"

### Defendant Buboltz - Specific Conduct

38. Specifically, Defendant Buboltz, prior to her resignation, made the following statements in a text message exchange with an existing Distributor:

- ". . .if people are so quick to follow its because so many are really struggling. I mean hell – if I having to supplement my income I know my team is in bad shape to [sic] ya know!"

- "All I hear from my team is the product doesn't work anymore. They are overwhelmed keeping up with all the new products. And what they are earning isn't worth the income because it [sic] costing them so much time to even get a customer. It's crazy how different it is for each."

- "They clearly did that so they could capitalize in this exact instance."

- "The website switch is going to be a disaster."

- "Girl! The hours it will take! I want to puke thinking about it. Every customer is going to have to go to new site and create a new account!"

- "All our business cards, all of our marketing material etc I mean all that is no good anymore."

39. Further, the existing Distributor contacted by Defendant Buboltz believed that Defendant Buboltz was criticizing Plaintiffs to entice the Distributor to leave Plaintiffs.

40. Upon information and belief, Defendant Buboltz repeated the foregoing statements to others, including other Distributors.

41. Defendant Buboltz also participated in the publicly available Facebook Coffee Chat Group on January 31, 2021.

### Breach Of Contract

42. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 41, inclusive as if set forth herein in full.

43. The Agreements constitute valid and binding contracts between Plaintiffs and Defendants. Plaintiffs have performed under the Agreements.

44.     Defendants have breached several of their obligations under the Agreements, and such breaches have proximately caused Plaintiffs to suffer damages.  Plaintiffs are entitled to injunctive relief pursuant to the Agreements.

### Violations Of Section 43(a) Of The Lanham Act
### For False Designation Of Origin

45.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 41, inclusive as if set forth herein in full.

46.     Defendants have violated Section 43(a) of the Lanham Act, Title 15 United States Code Section 1125(a), *et seq.*

47.     Defendants' conduct described above constitutes: (a) a false designation of origin; (b) a false or misleading description of fact; or (c) a false or misleading representation of fact which: (i)  is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants and Amplifei with the Plaintiffs or its products, or as to the origin or sponsorship of Defendants or Amplifei's goods, services or commercial activities with the Plaintiffs' products, or (ii) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities of Amplifei's goods, services or commercial activities for the Defendants' benefit.

48.     Defendants' use or intent to use the Elevacity Product Line (and associated Proprietary Rights) causes dilution of the distinctive quality and efficacy of the Elevacity Product Line (and the related Proprietary Rights).  Defendants willfully intended to trade on the Plaintiffs' reputation and success of its Elevate Product Line, especially the original Elevate Smart Coffee™ product, and to cause confusion as to the source and ownership of the Elevacity Product Line (and associated Proprietary Rights), including the <u>original</u> Elevate Smart Coffee™.

49. As a result of Defendant's knowing, intentional and willful violations of the Lanham Act, the Plaintiffs are entitled to actual damages, including those damages and remedies described in Title 15 United States Code Section 1117, and the destruction of all infringing materials pursuant to Title 15 United State Code Section 1118. Plaintiffs are entitled to injunctive relief pursuant to Title 15 United States Code Section 1116 and other applicable law.

## Tortious Interference With Business Relationships

50. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 41, inclusive as if set forth herein in full.

51. Defendants were aware of the existence of the business relationship between Plaintiffs and their Distributors and/or business partners, and through unlawful or tortious acts interfered with the relationship with such Distributors and/or business partners, including by engaging in the following conduct beginning at or about the time of Defendants' resignations on December 15, 2020 and continuing thereafter: (a) making false, misleading, disparaging and deceptive statements about Plaintiffs, (b) making statements which cast Plaintiffs in a negative light, and (c) soliciting Distributors away from Plaintiffs to join a competing venture, Amplifei.

52. As a proximate cause of all Defendants' tortious interference with business relationships, Plaintiffs have been damaged. Plaintiffs are also entitled to injunctive relief.

## Tortious Interference With Contract

53. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 41, inclusive as if set forth herein in full.

54. Defendants were aware of the existence of agreements between Plaintiffs and their Distributors and willfully and intentionally induced one or more of the Plaintiffs' Distributors to resign and breach their agreements with Plaintiffs in interference with Plaintiffs' rights and interests in such agreements with its other Distributors.

55. As a proximate cause of the Defendants' tortious interference with contract, Plaintiffs have been damaged. Plaintiffs are also entitled to injunctive relief.

### Misappropriation Of Trade Secrets And Proprietary Information

56. Plaintiffs repeats and reallege the allegations contained in paragraphs 1 through 41, inclusive as if set forth herein in full.

57. Plaintiffs' Distributor and/or customer lists (in any/all forms) were protected trade secrets of Plaintiffs. The conduct of Defendants constitutes a breach of their confidential relationship with Plaintiffs and a breach of their common law duty prohibiting the misappropriation of trade secrets and proprietary information which Defendants used or disclosed without Plaintiffs' authorization.

58. As a proximate cause of Defendants' misappropriation of trade secrets and proprietary information, Plaintiffs have been damaged. Plaintiffs are also entitled to injunctive relief.

### Statutory Theft Of Trade Secrets

59. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 41, and 57 through 58, inclusive as if set forth herein in full.

60. The conduct identified above also constitutes the misappropriation of trade secrets by improper means as such terms are defined by the Texas Uniform Trade Secrets Act, Sections 134A.001 *et seq.* of the Texas Civil Practice & Remedies Code.

61. Plaintiffs are entitled to recover damages for Defendants' misappropriation, including both the actual loss caused by the misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.

62. Defendants' misappropriation was both willful and malicious.

63. As a proximate cause of the Defendants' statutory theft of trade secrets, Plaintiffs have been damaged. Plaintiffs are also entitled to injunctive relief.

## Business Disparagement

64. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 41, inclusive as if set forth herein in full.

65. Defendants published false and disparaging information about Plaintiffs without privilege.

66. Defendant Benson stated to a Distributor that Plaintiffs paid the key principal of Amplifei, Robert Oblon, the sum of "*4 multi million dollars* [sic] *so who was wrong*." This statement by Defendant Benson falsely states that Plaintiffs admitted wrongdoing in prior litigation with Mr. Oblon which is expressly false. This statement further falsely states that the sum of "*4 multi million dollars*" [*sic*] was paid by Plaintiffs to Mr. Oblon. This too, was false, on the basis that the settlement of this prior litigation involved multiple parties including other parties unrelated to Plaintiffs and that such other parties contributed to this monetary settlement with Mr. Oblon in exchange for Mr. Oblon relinquishing any ownership claim to that third party company.

67. Defendant Benson stated to a Distributor that "*You will need to start over soon anyway*", implying that Plaintiffs were going out of business. The statement by Defendant Benson is false.

68. Defendant Althaus stated to a Distributor that *Elepreneurs was under financial strain and would be going out of business soon, and Elepreneurs was engaged in "shady stuff."* The statement by Defendant Althaus is false.

69. Defendant Buboltz stated to a Distributor that "*All I hear from my team is the product doesn't work anymore,*" and "*They clearly did that so they could capitalize in this exact*

*instance."*  The statement by Defendant Buboltz is false.

70. Defendants' disparagement is both willful and malicious.

71. As a proximate cause of the Defendants' business disparagement, Plaintiffs have been damaged.  Plaintiffs are also entitled to injunctive relief.

## Injunctive Relief

72. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 71, inclusive as if set forth herein in full.

73. Pursuant to Rule 65 of Federal Rules of Civil Procedure, Title 15 United States Code Section 1116, the terms of the Agreements, and other applicable law, Plaintiffs seek injunctive relief against Defendants, and those in active concert or participation with them.

74. Pursuant to Eastern District Local Rule CV-65, Plaintiffs will file a Motion for Injunctive Relief, in an instrument separate from this Complaint which shall include the specific grounds for the injunctive relief requested by Plaintiffs.

## Civil Conspiracy

75. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 71, inclusive as if set forth herein in full.

76. Defendants, two or more, combined to accomplish an unlawful purpose and/or to accomplish a lawful purpose by unlawful means, and Defendants reached a meeting of the minds on the object or course of action(s).  Defendants acted maliciously, without legal justification, and with the intent of injuring Plaintiffs.  As such, Defendants have engaged in a civil conspiracy.  In the course of their civil conspiracy, Defendants committed one or more unlawful, overt acts.  Such unlawful, overt acts include all Defendants' conduct described above.  Such actions subject all Defendants to joint and several liability.

**Exemplary Damages**

77.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 71, inclusive as if set forth herein in full.

78.     Defendants acted willfully, with fraud, malice or gross negligence toward Plaintiffs, entitling Plaintiffs to exemplary damages as provided by Chapter 41, 134A of the Texas Civil Practice & Remedies Code, and other applicable law.

**Attorneys' Fees**

79.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 78, inclusive as if set forth herein in full.

80.     Plaintiffs have hired the law firm of Jones, Davis & Jackson, PC to represent them in this matter and have agreed to pay such attorneys a reasonable and necessary fee for their services.  Pursuant to the Agreements, Sections 38.001 and 134A.005 of the Texas Civil Practice & Remedies Code, Title 15 United States Code Section 1117 and other applicable law, Plaintiffs are entitled to recover from Defendants their reasonable and necessary attorneys' fees.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Elepreneurs Holdings, LLC d/b/a Elepreneur, LLC, Elepreneurs U.S., LLC d/b/a Elepreneurs, LLC and SHRG IP Holdings, LLC pray that upon final hearing hereof, they have judgment against Defendants Lori Ann Benson, Andrea Althaus, and Lindsey Buboltz, jointly and severally, as follows:

1. for actual, consequential, incidental, statutory and exemplary damages;

2. for a temporary restraining order, preliminary injunction and permanent injunction as provided in a Motion for Injunctive Relief to be filed by the Plaintiffs;

3. for prejudgment interest, if applicable, at the highest lawful rate;

4. for reasonable and necessary attorneys' fees;

5. for costs of court;

6. for post-judgment interest on the above sums at the highest lawful rate; and

7. for such other and further relief to which Plaintiffs may be justly entitled

           Respectfully submitted,

           /s/ Matthew K. Davis
           Matthew K. Davis
           State Bar No. 05526000
           E-mail: mdavis@jonesdavis.com
           Designated Lead Attorney
           Scott R. Meyer
           State Bar No. 24051046
           E-mail: smeyer@jonesdavis.com

           JONES, DAVIS & JACKSON, PC
           15110 Dallas Parkway, Suite 300
           Dallas, Texas 75248
           Telephone: (972) 733-3117
           Fax: (972) 733-3119

           ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of February 2021, I electronically filed the foregoing document with the Clerk of Court for the United States District Court, Eastern District of Texas, using the Electronic Case Filing system of the Court, which will provide service copies to all counsel of record by electronic means.

           /s/ Matthew K. Davis